CITY ATTORNEY'S OFFICE
JUDITH R. BAUMANN, #015012
CLARENCE E. MATHERSON, JR., #021211
CATHERINE M. BOWMAN, #011713
21 E. Sixth Street, Suite 201
P.O. Box 5002
Tempe, Arizona 85280
Phone: (480) 350-8227
Fax: (480) 350-8645
Cityattorney_administrator@tempe.gov

Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jesse Castillo<br><br>        Plaintiff,<br><br>v.<br><br>City of Tempe, et al.,<br><br>        Defendants. | No. CV 12-02225-PHX-ROS<br><br>**DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

      Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1, Defendants City of Tempe, Tempe Police Department and Matthew Warbington hereby submit their Separate Statement of Facts in Support of the Motion for Summary Judgment:

      1.    On June 4, 2011, Jesse Castillo traveled to Mill Avenue in Tempe, Arizona, to celebrate his twenty-first birthday. (Deposition of Hilario Haro, attached hereto as Exhibit "A," at 24:18-23.)

      2.    Jesse's brothers, Joel Castillo and Hilario Haro, and his brother-in-law, Luis Vasquez, came with him to Mill Avenue. (*Id.*)

      3.    The group arrived in Tempe around 10 p.m. (Deposition of Jesse Castillo, attached hereto as Exhibit "B," at 25:2-5.)

4. The group initially checked into the Mission Palms Hotel near Mill Avenue and they each had several beers and some tequila to "pregame" before going out for the night. (Exhibit B at 26:17-22.; Exhibit A at 30:9-31:4.)

5. Castillo had at least one beer and one shot of tequila during the pregame in the hotel room. (Exhibit A at 32:4-11.)

6. After drinking beers in the hotel, the group went to a strip club and two or three bars in an approximately four hour period. (Exhibit B at 26:23-27:1)

7. Castillo had two Red Bull and vodka drinks and probably three to four Blue Moon beers over the four hour period. (Exhibit B at 27:9-24.)

8. At approximately 2:00 a.m. on June 5, the group left the last bar and decided to go to the Jimmy John's restaurant at 680 S. Mill Avenue to get something to eat. (Exhibit B at 33:5-17.)

9. On the way to Jimmy John's, Castillo and Velasquez began walking behind two women, later identified as Jennifer Beggs and Corinthia McGuire. (Exhibit B at 33:18-24.)

10. Beggs and McGuire began talking to Castillo and Velasquez. (Exhibit B at 33:22-23.) Beggs and McGuire were making fun of Castillo and Velasquez for wearing the same shirt. (Exhibit B at 34:21-35:1.)

11. As Beggs and McGuire were talking to Castillo and Velasquez, Beggs and McGuire's boyfriends, and James Sanciento and Jonathon Huckins, arrived. (Exhibit B at 33:18-24.)

12. Either Huckins or Sanciento asked Castillo and Velasquez, "What the f*** are you doing talking to our girls for?" (Exhibit B at 35:11-13.)

13. Castillo responded by saying that he was not "trying to get at them," and either Huckins or Sanciento started "swinging on [him]." (Exhibit B at 35:14-16.)

14. In response, Castillo pushed the man away from him. (Exhibit B at 35:14-16.)

2

15. The other man, later identified as Huckins, jumped on Velasquez's back and began hitting him. (Exhibit B at 35:17-21.)

16. Velasquez knocked Huckins to the ground and stood over him.

17. Beggs then began to strike Velasquez in the back and head area.

18. At that time, Joel Castillo pushed or directed Castillo and Velasquez into the Jimmy John's restaurant. (Exhibit B at 36:10-16.)

19. Sergeant David Breen and Officers Adam Miller and Bryan Berman were patrolling across the street from Jimmy John's and saw the fight occurring. (Affidavit of David Breen, attached hereto as Exhibit "C," at ¶ 4.)

20. One of the officers radioed for backup and they all proceeded across the street to the location of the fight. (*Id.*)

21. When Sergeant Breen arrived to the location, one of the women involved in the fight pointed to Castillo and Velasquez and told Sergeant Breen that they had been involved in the fight. (*Id.* at ¶ 5.)

22. Sergeant Breen noticed Castillo and Velasquez entering Jimmy John's and he directed Officers Matthew Warbington and Thomas Blank, who had just arrived, to go into the restaurant and bring Castillo and Velasquez out for questioning. (*Id.*; Deposition of Thomas Blank, attached hereto as Exhibit "D," at 24:2-16.)

23. The Jimmy John's restaurant is located in a narrow building. (Affidavit of Matthew Warbington, attached hereto as Exhibit "E," at ¶ 5.)

24. At the time Officers Warbington and Blank entered the restaurant there were approximately 40 to 50 inside the restaurant. (*Id.*)

25. Sergeant Breen identified Castillo and Velasquez as Hispanic males wearing identical blue and white striped plaid shirts. (*Id.* at ¶ 4.)

26. Officer Blank went into Jimmy John's, contacted Velasquez, and escorted him out of the restaurant without incident. (Exhibit D at 24:2-25:9.)

27. Officer Warbington went into Jimmy John's and contacted Castillo. (Exhibit E at ¶¶5-6.)

3

28. Officer Warbington did not know whether Castillo was with anybody other than the other Hispanic male Sergeant Breen had identified. (*Id.* at ¶ 5.)

29. Officer Warbington entered the restaurant, identified himself as a police officer to Castillo, and asked Castillo to step outside with him. (*Id.* at ¶ 6.)

30. Officer Warbington noticed that he Castillo exhibited signs of impairment and Officer Warbington smelled alcohol on Castillo's breath. (*Id.*)

31. Officer Warbington grasped Castillo's right hand and attempted to place it in an O'Donnel Continuous Control System ("OCCS") hold. (*Id.*)

32. Officer Warbington did not apply excessive pressure to the OCCS hold; he used the OCCS hold to escort Castillo from the restaurant. (*Id.*)

33. Initially, Castillo cooperated with Officer Warbington and began to walk towards the front door of the restaurant. (*Id.* at ¶ 7.)

34. As Officer Warbington and Castillo neared the front door of the restaurant, Castillo tensed his right arm and attempted to pull it out of Officer Warbington's grasp. (*Id.*)

35. At that point, Officer Warbington decided to detain Castillo in handcuffs due to Castillo's attempt to tense his arm and pull out of Officer Warbington's grasp. (*Id.*)

36. Officer Warbington advised Castillo to stop tensing his arm and put both hands behind his back. (*Id.*)

37. Castillo continued to tense his arm and tried to pull away from Officer Warbington. (*Id.*)

38. As Officer Warbington and Castillo reached the front door of the restaurant, Sergeant Breen entered the restaurant to assist Officer Warbington and he grabbed Castillo's left arm. (*Id* at ¶ 8.)

39. Castillo resisted Sergeant Breen's grasp and began pulling his left arm in front of his body. (*Id.*)

4

40. Sergeant Breen told Castillo to stop resisting, but Castillo refused to cooperate. (*Id.*)

41. Castillo continued struggling with Officer Warbington and Sergeant Breen after they exited the restaurant. (*Id.* at ¶ 10.)

42. At that point, Officer Warbington again believed it was necessary to detain Castillo immediately on the sidewalk because there were approximately 75-100 people in close proximity to them. (*Id.*)

43. Sergeant Breen and Officer Warbington separately attempted to take Castillo to the ground by using leg sweeps; however, their attempts were unsuccessful. (*Id.* at ¶ 11.)

44. Eventually, Officer Warbington, Sergeant Breen and Castillo ended up on the ground by unknown means. (*Id.*)

45. While on the ground, Sergeant Breen and Officer Warbington told Castillo to turn onto his stomach and put his hands behind his back. (*Id.* at ¶ 12.)

46. Against their instruction, Castillo continued to try and pull his arms away from Sergeant Breen and Officer Warbington and turn onto his back, fighting them off. (*Id.*)

47. After struggling with Castillo for a while, Sergeant Breen announced that he was going to use his Taser on Castillo. (*Id.*)

48. Sergeant Breen employed a drive stun into Castillo's lower back while Castillo was on his side, but Castillo twisted away and pushed Sergeant Breen into a puddle on the sidewalk. (*Id.* at ¶ 13.)

49. Castillo was then able to pull his right arm away from Officer Warbington and rotate his body so that he was almost on his back. (*Id.*)

50. Sergeant Breen then used the Taser a second time on Castillo, but Castillo was able to turn completely onto his back. (*Id.*)

5

51. The Taser seemed to be ineffective against Castillo, and Officer Warbington was still concerned about the proximity of the large crowd around us. (*Id.* at ¶ 14.)

52. Because the Taser proved ineffective and Officer Warbington was worried about the length of time they had been struggling to control Castillo, he decided to deploy three to four closed-fist strikes to Castillo's face. (*Id.* at ¶ 15.)

53. Officer Warbington's goal in using the closed-fist strikes was to disorient or disrupt Castillo's bio-computer or his thought processes long enough so that he and Sergeant Breen could attempt to put him in handcuffs. (*Id.*)

54. Officer Warbington learned the technique of disrupting a suspect's bio-computer by using strikes to the head during his training at the law enforcement academy and at the City of Tempe. (*Id.* at ¶ 16.)

55. Even after the closed-fist strikes, Castillo still would not comply with the officers' attempts to detain him. (*Id.* at ¶ 17.)

56. The closed-fist strikes appeared to have no effect on him. (*Id.*)

57. Castillo continued to pull his arms away from Sergeant Breen and Officer Warbington and struggled to get out of their grasp. (*Id.*)

58. Sergeant Breen used the Taser for a third time and Castillo fought to push the Taser away with his hands. (*Id.* at ¶ 18.)

59. The Taser still seemed to be ineffective. (*Id.*)

60. Officer Warbington struck Castillo in the face three or four more times in an attempt to disorient him. (*Id.*)

61. At that point, Castillo appeared to be disoriented and Sergeant Breen and Officer Warbington were able to turn him onto his stomach and secure him in handcuffs. (*Id.*)

62. Sergeant Breen and Officer Warbington then escorted Castillo to the curb where he remained seated for further investigation. (*Id.* at ¶ 19.)

6

63. Castillo appeared to be bleeding on the right side of his forehead and near his left eye. (*Id.*)

64. Sergeant Breen and Officer Warbington then called the Tempe Fire Department to render aid to Castillo. (*Id.*)

65. Upon checking Castillo's record, the officers found a warrant for his arrest for driving under the influence of alcohol. (*Id.* at ¶ 20.)

66. Officer Warbington read Castillo his Miranda Rights. (*Id.*)

67. Castillo stated that he understood his rights and was willing to answer questions. (*Id.*)

68. Castillo stated that he did not remember the fight and did not remember struggling with police. (*Id.*)

69. Castillo advised Officer Warbington that if he was struggling with police that everything was his fault and he did not have "hard feelings" toward the officers. (*Id.*)

70. Castillo stated that he was drinking on Mill Avenue prior to the fight that evening, but he was unable to tell the officers how much he had to drink. (*Id.*)

71. The Tempe Fire Department assessed Castillo's injuries at that time, and determined that he should be transported to the hospital for further examination and treatment. (*Id.* at ¶ 21.)

72. While detaining Castillo, Officer Warbington was not attempting to injure him. (*Id.* at ¶ 22.)

73. Officer Warbington's intent in using the closed-fist strikes was to disorient Castillo long enough to get him handcuffed and under control. (*Id.*)

74. Because of Officer Warbington's position next to Castillo during the struggle, if Officer Warbington had been attempting to use the closed-fist strikes for pain compliance, the only target he would have had would have been Castillo's head area. (*Id.* at ¶ 23.)

7

75. Officer Warbington did not call Castillo a "beaner" or any other derogatory name during the altercation. (*Id.* at ¶ 24.)

76. Plaintiff's police practice and procedures expert agrees that Officer Warbington had the authority to contact Plaintiff about the fight:

> Q. Okay. Do you have an opinion as to whether or not the officers' initial contact with Mr. Castillo was authorized?
>
> A. Under reasonable suspicion?
>
> Q. Yes.
>
> A. Yes, sir.
>
> Q. What's that opinion?
>
> A. That they had reasonable suspicion.

(Deposition of Jess Torrez, attached hereto as Exhibit "F," at 37:13-20.)

77. Plaintiff's police practices and procedures expert agrees that Officer Warbington had reasonable suspicion to detain Plaintiff and to use appropriate force to detain him if necessary:

> Q. Okay. Would that detention also involve putting a suspect in handcuffs if that officer believed that that was necessary?
>
> A. Yes, sir.
>
> Q. Okay. So the officers were authorized, if they believed they had reasonable suspicion, to go in, contact Mr. Castillo, and handcuff him for the investigatory detention so they could determine whether or not he was involved in this incident?
>
> A. Yes, sir. Under the case law that's – that has -- under the case law from the United States Supreme Court, yes, sir.
>
> Q. Okay. Is it -- is it your opinion that they had reasonable suspicion at that point?

8

>   A. Yes, sir. If their sergeant or another officer at the scene has information and belief, absolutely, and he asks him to go in there and contact these two individuals, yes, sir.

(*Id.* at 38:4-21.)

78. Plaintiff's police practices and procedures expert agrees that Sergeant Breen's use of the Taser on Plaintiff was not unreasonable under the circumstances:

>   Q. I believe we talked earlier and you said you didn't have an opinion as to whether Sergeant Breen used excessive force. So that TASER deployment would have been reasonable under the circumstances?
>
>   MR. BENSON: Objection to form.
>
>   BY MR. MATHERSON:
>
>   Q. In your opinion?
>
>   A. I believe that it would not have been unreasonable force.
>
>   Q. Okay. So if it would not have been unreasonable, then it would have been reasonable?
>
>   A. Yes, sir. I'm sorry.

(*Id.* at 70:25-71:11.)

>   Q. Do you have any reason to believe that the second drive stun by the -- with TASER by Sergeant Breen was unreasonable?
>
>   A. No, sir.

(*Id.* at 72:2-72:5.)

79. Plaintiff's police practices and procedures expert believes that Officer Warbington had the right to use force against Plaintiff:

>   Q. It's your opinion that Officer Warbington could have struck Mr. Castillo like he did as long as he had done it in the upper shoulder area; is that your opinion?

9

>A. Yes, sir. That's -- he could have struck him in the upper shoulder and he also could have –
>
>Yes, sir. Let's just leave it at yes, sir.

(*Id.* at 87:23-88:3.)

80. Plaintiff's police practices and procedures expert believes that Officer Warbington's conduct was unreasonable based on the location of Officer Warbington's closed-fist strikes and the number of closed-fist strikes delivered:

>Q. Officer Warbington says, "Due to the fact that Castillo continued to resist efforts to detain him, the TASER proved ineffective, and there were still a large number of intoxicated people in close proximity to where the struggle was occurring, I gave Castillo three to four closed fist strikes to the face." Do you see that?
>
>A. Yes, sir.
>
>Q. Do you have any -- what's your opinion with regard to Officer Warbington's use of his closed fist strike?
>
>A. It was excessive.
>
>Q. And why would you say that's excessive?
>
>A. Well, for one, Officer Warbington -- there's -- you could hit a large muscle bone -- or I'm sorry -- large muscle mass and it would allow -- like a giant Charley horse for the common person. So it's going to allow you to take -- it will loosen his arms up and it will allow him to bring his arms in back of him so that he can go ahead and effect the arrest and handcuff him, rather than striking him in the face, which is hard empty hand technique and is probably going to cause injury. Or more than likely going to cause injury.
>
>Q. Okay. So it's -- it's your opinion that Officer Warbington had the right to strike Mr. Castillo? It's just a matter of where he struck Mr. Castillo?
>
>A. Not only where he struck Mr. Castillo and the number of times that he struck Mr. Castillo.

10

> Q. Okay. So it's your opinion that he would have had the right to strike Mr. Castillo at some point. It's just where he struck him and the number of times that he struck him?
>
> A. That's correct.

(*Id.* at 72:6-73:14.)

81.   Plaintiff's police practices and procedures expert agrees that officers are taught in the academy and during training to strike a subject in the head to disrupt their bio-computer to gain compliance over them:

> Q. Do you know the -- what -- why Mr. -- Officer Warbington was striking Mr. Castillo, whether it was for pain compliance or for some other reason?
>
> MR. BENSON: Objection. Foundation.
>
> THE WITNESS: I'm sorry. Could you repeat that question?
>
> BY MR. MATHERSON:
>
> Q. Sure. Do you know why Officer Warbington was striking Mr. Castillo? Was it for pain compliance? Because you can -- you can use techniques for pain compliance; right?
>
> A. That's correct.
>
> Q. And that pain will hopefully make a suspect comply to whatever you're asking him to do?
>
> A. That's correct.
>
> Q. Okay. And there are other reasons to use other techniques; correct?
>
> A. Correct.
>
> Q. Do you know why Officer Warbington was striking Mr. Castillo?
>
> A. His report is that with this bio-computer -- the phrase bio-computer, they use that in the defensive tactics manual. There really is no such phrase -- that I know of, no such phrase. It's

11

essentially, the brain.  You're striking so that you can jar the brain.  They put the term bio-computer because it's a lot more jury friendly than saying you're trying to jar his brain.

Q. So that's something that the officers are taught?

A. Yes, sir.

Q. And that's in defensive tactics?

A. Yes.

Q. Okay. And is that at the academy, do you know?

A. I believe it would be not only at the academy, but the continual defensive tactics that they receive throughout their career.

(*Id.* at 73:15-74:25.)

82. Castillo was charged with and convicted of Disorderly Conduct in violation of Arizona Revised Statutes § 13-2904(A)(1) based on his involvement in the fight prior to his entering the Jimmy John's restaurant.  (City of Tempe Municipal Court Minute Entry of Judgment for Case No. 11-069320-2, attached hereto as Exhibit "G," at COT004711.)

DATED this 29th day of November, 2013.

/s/ Clarence E. Matherson, Jr.
Andrew B. Ching
Clarence E. Matherson, Jr.
Catherine M. Bowman
CITY ATTORNEY'S OFFICE
21 E. Sixth Street, Suite 201
P.O. Box 5002
Tempe, Arizona 85280
Attorneys for Defendants

12

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice Electronic Filing to the following CM/ECF registrants:

Benedetto Torgenson, PLC
Stephen Benedetto
John P. Torgenson
1433 North 3rd Avenue
Phoenix, Arizona  85003
*Attorneys for Plaintiff*

/s/ Clarence Matherson Jr.